UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEYLEN M. DUNN,<br><br>    Petitioner,<br><br>    v.<br><br>PATRICK COVELLO,<br><br>    Respondent. | Case No. 21-cv-9036-PCP<br><br>**ORDER DENYING PETITION<br>FOR WRIT OF HABEAS CORPUS** |

Keylen Dunn filed this *pro se* action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support thereof and lodged exhibits with the Court. Mr. Dunn filed a reply. For the reasons discussed below, the Court denies the petition.

**BACKGROUND**

Mr. Dunn was charged with a February 2016 robbery and a July 2016 murder. *People v. Dunn*, A155981, 2021 WL 973386, at *1 (Cal. Ct. App. Mar. 16, 2021). A jury found Mr. Dunn guilty of robbery, found him not guilty of first-degree murder, and deadlocked as to second-degree murder. *Id*. At retrial, the jury found Mr. Dunn guilty of second-degree murder. *Id*. He was sentenced to a prison term of 17 years to life. *Id*. The California Court of Appeal affirmed the conviction. *Id*. The California Supreme Court denied review. Answer, Ex. E.

The following background on Mr. Dunn's trial is taken from the California Court of Appeal opinion:[1]

---

[1] The facts have not been rebutted with clear and convincing evidence and must be presumed correct. 28 U.S.C. § 2254(e)(1); *Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

A. The Prosecution Case

On July 8, 2016, around 6:45 p.m., Bryan Abernathy was sitting in his truck at Kennedy Park in Richmond. In his rearview mirror, he saw that about 50 feet away from him, defendant was chasing Eaen Hale. Abernathy knew both defendant and Hale and considered them friends. He also knew defendant and Hale hung out together. Abernathy turned and watched defendant chase Hale around a car, then return to the park. During this initial chase, defendant got within about five feet of Hale, but Abernathy did not see defendant catch up to him or see anything in either of their hands.

Several minutes later, Abernathy saw defendant chase Hale across the street, then they went down to the ground, disappearing from Abernathy's view in front of another car. After about a minute or two, defendant "popped up" and ran in front of Abernathy's truck holding what appeared to be a bloody knife.

At this point, Abernathy exited his truck and found Hale on his stomach in a pool of blood. Abernathy did not see any weapons near Hale. When Officer Alexis Bartley arrived at the scene, she found the victim lifeless. Abernathy told Bartley he saw a knife only when defendant was running away. Abernathy later told another officer that defendant was "5150," by which he meant crazy.

The prosecution introduced evidence of a 911 call Hale made at 6:47 p.m. the day of his death. The phone call begins with Hale telling the dispatcher that defendant popped his tires with a knife, hit him in the mouth, and would have stabbed him if he had not run away. Hale then said that defendant, who had gone to the other side of the park, was coming back with "a long ass knife" and he had to get away. At this point in the call, Hale repeatedly yells things like, "I don't know what to do" and "Oh no."

Hale's autopsy revealed he died from a single stab wound to the chest, where the knife pierced his lung and aorta and was stopped by a vertebra. Hale also had small abrasions to his forehead and cheek that occurred around the same time as the stabbing. A police officer observed a fresh abrasion on defendant's left middle finger knuckle after his arrest.

The prosecution also introduced evidence of two uncharged prior acts under Evidence Code section 1101, subdivision (b), i.e., a robbery defendant committed in February 2016 and an incident at a bar where he fought with and threatened the bouncer.

B. The Defense Case

Defendant took the stand and testified about his past and the circumstances up to the time of Hale's death. He was first hospitalized in a psychiatric ward when he was a teenager after having a nervous

breakdown because he believed his mother was incorrectly preparing his food. He would barricade himself in his bedroom, and he was paranoid. He began taking psychiatric medications at around 13 or 14 years old and currently takes medications for schizophrenia and bipolar disorder. He fears being shot and killed because in his late teenage years, he was shot in the leg by someone who robbed him, and he also had friends die from being shot. He was homeless since 2014. A few weeks before Hale's death, defendant admitted himself to a psychiatric ward because he was out of medications, he thought he smoked "laced" marijuana, and he did not feel normal. He obtained medications during that hospitalization, but ran out at least a week before Hale's death and could not obtain a refill. On the day Hale died, the car that defendant had been sleeping in was towed away along with his belongings.

Defendant testified that he and Hale had been friends since defendant was a teenager and that he never wanted Hale dead. Hale was also homeless and slept around Kennedy Park in cars. The day Hale died, defendant was smoking marijuana in a restroom at the park when Hale came inside to smoke methamphetamine. After defendant lent Hale his lighter, Hale burned defendant's hand with his pipe while offering him methamphetamine. Defendant reacted by shoving Hale's hand away. Hale got upset and left. Defendant followed to get his lighter back, but Hale said he was angry and pulled out a knife. Hale then turned and ran away, and defendant gave chase because he wanted to know why Hale pulled out the knife and because he was concerned that Hale was going to retrieve a gun. Defendant testified that Hale had previously told defendant he had guns, and defendant also heard "through the grapevine" that Hale had engaged in a shooting. Defendant chased Hale across the street, then Hale tripped and fell onto his own knife, which "planted into his chest."

Afterwards, defendant retrieved his shopping cart, which contained his belongings, and left the area. He never called for help or tried to help Hale. The police arrested defendant two days later. When asked at trial about three knives found in his shopping cart, defendant testified he did not know they were there, he had never seen them before, and he never carried knives.

The defense also presented evidence regarding defendant's mental and cognitive functioning. One witness testified that, during the six weeks preceding Hale's death, he had observed and heard defendant acting erratically, including being nonresponsive to questions or making animal noises, and frequently screaming gibberish at the top of his lungs at night.

A licensed social worker working at the jail saw defendant in mid-July 2016, and recalled that defendant appeared unmedicated and "thought-blocked" (meaning there was a delay in his responses to

questions), with apparent borderline intellectual functioning and an irrational, disorganized manner of speech. A jail psychiatrist testified that defendant has schizophrenia and that she treated him for psychosis in September 2016. Further, two experts testified about elevated levels of violence that homeless people face and how this impacts them, such as their reactions to perceived threats.

Additionally, the defense presented Dr. Jodi Couick, a school psychologist who assessed defendant in 2006 and determined he qualified for special education as a teenager. Her testing indicated that defendant scored in the range of 67–78 for cognitive ability, where the range for "intellectual disability" is around 70; that defendant had limited problem solving skills; and that he had faulty reasoning and poor "reality testing." Defendant's reality testing became weaker when dealing with emotional stimuli, and so "he might misperceive situations and not anticipate consequences" to his actions.

An expert in neuropsychology, Dr. Dale Watson, assessed defendant cognitively and found him mildly intellectually disabled with an IQ of 72. Among other things, Dr. Watson testified that defendant has frontal lobe dysfunction, which is generally associated with impulsivity and perseveration, and that he has schizophrenia and poor "reality testing" which is associated with poor judgment. Defendant also "elevated another index called the 'vigilance composite'" and "people who elevate this tend to be . . . hyper sensitive to threat, they're paranoid." Dr. Watson did not ask defendant anything about what happened on the day of or during the alleged murder or the prior robbery.

*Dunn*, 2021 WL 973386, at *1-3 (footnotes omitted).

Mr. Dunn timely filed this habeas petition and argues that: (1) the trial court erred by not instructing the jury on the lesser included offense of involuntary manslaughter; (2) the trial court issued an erroneous instruction on the defense of accident and should have issued a separate pinpoint instruction; and (3) the trial court erred by admitting evidence of his prior bad acts.

## STANDARD OF REVIEW

If a claim has been adjudicated on the merits in state court, a federal habeas court may not grant relief to a person in custody pursuant to a state court judgment unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

4

"[F]or a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In this case, the Court looks to the opinion from the California Court of Appeal for the first two claims. For the reasons discussed below, the third claim will be reviewed *de novo*.

## ANALYSIS

### I.   Involuntary Manslaughter Instruction

Mr. Dunn argues that the trial court violated his constitutional rights by failing to instruct the jury on the lesser included offense of involuntary manslaughter.

**Legal Standard**

The Supreme Court has held that a defendant has a constitutional right to have the jury instructed on lesser included offenses only in capital cases. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). In so holding, the Supreme Court expressly declined to state whether that right extended to non-capital cases. *Id.* at 638 n.14. "Under the law of [the Ninth Circuit], the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

Nonetheless, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)). *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser included offense. *See Solis*, 219 F.3d

5

929–30 (finding no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction, and finding no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

**Discussion**

The California Court of Appeal denied this claim:

> During trial, defense counsel requested an instruction on involuntary manslaughter, arguing the evidence supported the theory that defendant brandished a knife—a misdemeanor—with criminal negligence. Defendant contends the trial court's refusal to give the requested instruction was error. FN. 4. We do not agree.
>
>> FN. 4. The trial court did instruct the jury as to second degree murder, and the lesser included offense of voluntary manslaughter under the theories of heat of passion and imperfect self-defense.
>
> . . . .
>
> Defendant claims he was entitled to an involuntary manslaughter instruction on two grounds. First, the jury could have believed that he killed the victim without malice while committing the misdemeanor brandishing of a knife. Based on a combination of Abernathy's testimony, the 911 call, and his own testimony, he suggests the jury could have believed that: defendant had a knife; he "chased after Hale while holding the knife, but without pointing the knife at Hale," so he was "merely brandishing the knife"; and "[w]hen [defendant and Hale] went behind a parked car, and disappeared from Abernathy's view, Hale slipped and fell on the knife."
>
> The problem with this is that defendant's proposed scenario lacks evidentiary support. While highlighting Abernathy's testimony as indicating that he had a knife when he chased Hale, defendant points to no evidence showing that he chased Hale "without pointing the knife at Hale." Furthermore, there was no evidence indicating Hale slipped and fell on defendant's knife. Defendant specifically denied ever having a knife and testified Hale tripped and fell on Hale's own knife, so defendant's testimony does not support his proposed scenario. Neither did the prosecution's evidence, which showed that defendant had a knife and intentionally stabbed Hale. In short, the evidence did not support a theory that Hale was accidentally stabbed in the course of defendant merely brandishing a knife, as he suggests.

> Alternatively, defendant claims he was entitled to an involuntary manslaughter instruction because the mental health evidence supported the theory that "a person with [his] mental impairments could have acted without implied malice because he lacked the subjective awareness that his conduct carried a high degree of probability that it will result in death. [Citation.] A person with schizophrenia and with [his] other mental impairments could have brandished or wielded a knife without the intent to kill, because he lacked the ability to think things through to the end."
>
> Here, the evidence showed that, during the first chase, defendant popped Hale's car tire with a knife, threatened him, and "definitely" would have stabbed him had he not run away. Minutes after the first chase, defendant returned from across the park and chased Hale again, ending with Hale fatally wounded and defendant holding a bloody knife. Considering this evidence and the record as a whole, there was nothing to indicate that defendant did these actions without intending to kill Hale or with a failure to grasp the risk of his actions. Indeed, defendant testified that he knows stabbing someone in the chest is dangerous to life. And Dr. Watson offered testimony that someone with defendant's IQ is generally smart enough to know that stabbing someone is dangerous to human life.
>
> Defendant additionally asserts that a person with his conditions "could have acted without the intent to kill, because homeless people have hair-trigger tempers and respond quicky and inappropriately to anything they see as a threat." Further, he claims, he "could have lacked the intent to kill, because Hale was his friend." This is unpersuasive. Whether a hypothetical person could have acted without intent to kill for these reasons is not substantial evidence that defendant personally lacked express or implied malice.
>
> In sum, the trial court did not err in refusing to instruct on involuntary manslaughter.

*Dunn*, 2021 WL 973386, at *3-5 (footnote omitted).

Although the Ninth Circuit has recognized the potential viability of such a theory, there is no clearly established United States Supreme Court authority requiring a state trial court to instruct on a lesser included offense in a non-capital case. For that reason alone, the state court's rejection of this claim was not an unreasonable application of clearly established Supreme Court law, and Mr. Dunn is not entitled to habeas relief. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

Even looking to the merits, Mr. Dunn's claim must be denied. The California Court of

Appeal reviewed the evidence at trial and Mr. Dunn's arguments and found that there was no evidence to warrant an involuntary manslaughter instruction, because the evidence did not support a theory that Mr. Dunn lacked the intent to kill. A review of the evidence demonstrates that the state court's conclusion was not unreasonable. Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). Nor is the defendant entitled to have jury instructions raised in his precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). The state court's decision that the evidence did not support an involuntary manslaughter instruction was not unreasonable, so Mr. Dunn would not be entitled to habeas relief even if the Supreme Court's precedents supported his legal theory.

## II. Defense of Accident Instruction

Mr. Dunn next argues that the trial court issued an erroneous jury instruction concerning the defense of accident and should have issued a different instruction.

**Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). *See, e.g.*, *Reno v. Davis*, 46 F.4th 821, 841 (9th Cir. 2022) (concluding that state high court's interpretation of state death penalty statute and finding that unanimity instruction was consistent with state law bounds federal court on habeas review); *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (holding that state law determination that arsenic trioxide is a poison as a matter of law, not an element of the crime for the jury's determination, was not open to challenge on federal habeas review). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction. *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

8

process. *See Estelle*, 502 U.S. at 72; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

**Discussion**

The California Court of Appeal summarized the factual background and denied this claim:

> To have misinstructed on the defense of accident, the trial court must have instructed on it. Here, the court never instructed on it. Defendant, however, highlights the following verbal statement that the court made to the jury prior to instructing on murder: "There is no claim in this case that there's a legally permissible excuse for the second degree murder charge except to the extent that there is a claim that the defendant did not have and the proof does not show beyond a reasonable doubt that he had the specific intent to commit the crime itself. Alternatively, that the event that happened was an accident, that he took no participation in or caused the death of the victim, Mr. Hale. So there is testimony from the defendant that the stabbing injury took place without his involvement in it." On appeal, defendant contends this oral statement amounted to an erroneous instruction on the defense of accident.
>
> This statement cannot reasonably be viewed as an instruction on the defense of accident. The trial court was telling the jury there was no defense other than defendant's claims that (1) the evidence failed to prove the *mens rea* of the offense, or (2) the evidence failed to prove the necessary *actus reus* because the victim accidentally stabbed himself causing his own death. The court never indicated defendant had a possible defense on the ground that defendant accidentally stabbed the victim. Because the court never instructed on the defense of accident, it cannot be said the court misinstructed on that defense.
>
> As for defendant's claim that the trial court had a duty to instruct on accident, we reject the claim. A court has no *sua sponte* duty to instruct on the defense of accident; such an instruction generally must be requested. (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.) Here, defendant concedes his trial counsel did not request an instruction on accident at the second trial.
>
> Defendant raises two arguments for why he believes the trial court had a *sua sponte* duty to instruct on accident. First, relying on the same alleged verbal misinstruction quoted above, defendant argues the court "acquired the *sua sponte* duty to give a correct instruction on accident" when it gave the alleged misinstruction. Having already concluded that the quoted statement was not an instruction on the defense of accident, we find this claim without merit.

9

>Second, defendant contends the trial court refused his request to give an accident instruction at the first trial and, before the second trial, the court indicated its rulings at the first trial would stand. As such, he "did not have to repeat at the second trial his request for an instruction on accident in order to preserve this issue." We are unpersuaded.
>
>The portions of the record that defendant cites to support this argument disclose that the trial court indicated its prior rulings on motions in limine and concerning the admission of evidence from the first trial would stand unless the parties asked for reconsideration. Defendant's motions in limine from the first trial did not include a request for an accident instruction. Moreover, at the jury instruction conference during the second trial, defense counsel had every opportunity to ask for an accident instruction if she felt the evidence warranted it. She did not do so.
>
>Finally, and in any case, defendant fails to show he was entitled to an accident instruction. Defendant suggests that such an instruction was required because a combination of prosecution and defense evidence tended to show that he "did not brandish the knife. He merely held it down by his side. Then Hale stumbled and accidently fell on the knife." As already discussed, there was no evidence supporting the theory that Hale was accidentally stabbed as defendant was merely brandishing a knife. Similarly, there was no evidence that defendant merely held a knife that the victim fell onto.
>
>In sum, we reject defendant's claims of instructional error concerning the defense of accident.

*Dunn*, 2021 WL 973386, at *5-6 (footnote omitted).

The California Court of Appeal found that the trial court did not commit any error in instructing the jury on the defense of accident because the trial court never issued an instruction regarding the defense of accident. The appellate court's holding that the trial court's statement to the jury was not a jury instruction was not an unreasonable determination of the facts. Nor is Mr. Dunn entitled to relief for his argument that the trial court had a *sua sponte* duty to issue the instruction or was required to issue it due to Mr. Dunn requesting the instruction at the first trial. The California Court of Appeal reasonably found that the trial court had no duty to issue the instruction when it was neither requested by counsel nor supported by the evidence and that Mr. Dunn never requested the instruction at the first trial.

Mr. Dunn's arguments for habeas relief for this claim only involve errors of state law.

Even if there was an error, any error of state law does not warrant federal habeas relief. *See Estelle*, 502 U.S. at 71–72. To the extent that the trial court's statement could be construed as a jury instruction, Mr. Dunn has not shown that the erroneous instruction by itself so infected the entire trial that the resulting conviction violates due process. A review of the record supports the California Court of Appeal's finding that there was insufficient evidence to support the theory that the victim accidentally fell on the knife.

Nor is Mr. Dunn entitled to habeas relief to the extent he argues that the trial court had a duty to *sua sponte* issue the instruction. The California Court of Appeal found that there was little evidence to support the theory that the victim accidentally fell on the knife. Similar to the claim above, due process does not require that an instruction be given unless the evidence supports it. *See Hopper*, 456 U.S. at 611; *Menendez*, 422 F.3d at 1029. The state court's denial of this claim was not unreasonable; therefore, the claim is denied.

### III.    Prior Bad Acts

Mr. Dunn next contends that the admission of his prior bad acts of robbery and criminal threats violated his constitutional due process rights. Respondent argues that this claim is unexhausted, procedurally defaulted, and fails on the merits.

**Legal Standard**

A federal habeas petitioner may not challenge an evidentiary ruling on the grounds that it violated the state's evidence code. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Rather, an evidentiary ruling may be challenged only if it rendered the trial so fundamentally unfair as to violate due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir. 2006) (quoting *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005)). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101. Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due

11

1  process. *See Jammal*, 926 F.2d at 920.

2  **Discussion**

3  The California Court of Appeal summarized the factual background and denied this claim:

> During trial, the court permitted the prosecution to introduce evidence of prior acts under Evidence Code section 1101(b) to prove that defendant, despite his cognitive and mental health issues, could and did engage in goal-oriented behavior and form the intent necessary for murder. That evidence was [as] follows.
>
> First, in February 2016, defendant attacked a man, Dorotheo S., in front of a liquor store next to Kennedy Park and took his bicycle. Dorotheo S. testified defendant took him by surprise, pushing him off of his bicycle which fell on top of him, then hit him repeatedly even as he tried crawling under a car to stop the attack. Defendant also kicked Dorotheo S. after obtaining the bicycle. Later, when Officer Marshal Pagaling and another officer located defendant in the park with the bicycle and called to him, defendant responded, "are you here for the bike," then walked away. Eventually defendant started running and ignored orders to stop. When Pagaling was about 18 feet from defendant, defendant stopped and turned with his fists clenched, refusing to comply with orders to get on the ground. Pagaling forced him to the ground and handcuffed him.
>
> Second, in 2013, a bouncer at a bar, William S., asked defendant to leave the bar after a woman complained defendant was drinking her beverages while she was on the dance floor. After William S. escorted defendant to the door, defendant insulted and cursed at him, and threatened to "kick [his] butt." In front of the bar, defendant took a swing at William S. and missed, then William S. hit him. Defendant fell to the ground, then went to a garbage can and threw garbage at William S. The incident ended when an officer arrived at the scene. A week later, defendant stood across the street from the bar with his hand behind his back and told William S. he was going to shoot him. William S. took a step toward the defendant, a sort of lunge, but defendant stayed put. At that point, William S. thought that if defendant had a gun he would use it, so William S. "challenged" defendant and went after him. Defendant ran, throwing a rolled-up magazine and a bottle at William S. in the process. William S. testified defendant "didn't have a gun on him that I saw. Just acted like he appeared to have one.".
>
> . . . .
>
> Evidence of the 2016 Robbery
> Defendant contends there was insufficient similarity between the

charged homicide and the robbery evidence for the latter to be admissible under Evidence Code section 1101(b). He also argues the robbery evidence should have been excluded under Evidence Code section 352. We see no abuse of discretion.

As discussed, defendant presented evidence at trial concerning his mental and cognitive disabilities. (See *ante*, pp. 5–6.) For example, Dr. Couick determined from one test that defendant had limited problem solving skills, which could affect a person's ability to anticipate consequences. Dr. Couick also determined, based on the Rorschach Ink Blot Test, that defendant had poor reality testing and that when dealing with emotional stimuli, defendant "might misperceive situations and not anticipate consequences" to his actions. Dr. Watson testified that defendant has, among other things, an intellectual disability, frontal lobe dysfunction, and schizophrenia. Hypothetically, Dr. Watson opined, a person with defendant's psychiatric and cognitive disabilities could overreact or react impulsively to a stressful situation. Also, hypothetically, defendant's psychiatric and cognitive disabilities could and likely would impair a person's appreciation of the risk of his own actions, and his mental illness could affect someone's perception of the need to defend themselves.

During closing argument, defense counsel relied on the mental health evidence to argue that (1) defendant could not or did not act with intent to kill or subjectively appreciate the risks of his actions as required for implied malice; (2) defendant acted rashly in the heat of passion, after being provoked; and (3) he subjectively believed he was in danger and had to defend himself with deadly force, and thus acted in imperfect self-defense.

We see no abuse of discretion in the trial court's admission of the robbery evidence. The evidence that defendant took the bicycle from the victim and that he later avoided the police reasonably supported the inference that defendant was capable both of acting with intention and toward a goal, and of understanding action and consequence. As the evidence was plainly probative on the issue of whether defendant could and did form the mental state necessary for murder, it was admissible under Evidence Code section 1101(b).

. . . .

In sum, the trial court did not err or abuse its discretion in admitting the evidence of the robbery.

Evidence of the Incidents involving William S.
Defendant contends the trial court erred in admitting the evidence of his threats to kick William S.'s "butt" and to shoot William S. because the evidence fell short of satisfying the various elements of the crime

13

> of criminal threats. Relatedly, he claims the court erred in giving its CALCRIM No. 375 instruction with regard to the evidence that he threatened to shoot William S. He also contends that the incidents were insufficiently similar to the charged murder to be admissible to prove malice under Evidence Code section 1101(b), and that the court should have excluded them under Evidence Code section 352.
>
> . . . .
>
> "Under the Evidence Code, the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues." (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115.) "'[O]rdinarily, determining the relevance of proffered "other act" evidence presents solely a question of law for the court because the defendant does not dispute the fact of the prior act but merely argues its legal inadmissibility.' [Citation.] But if a defendant claims he did not commit the other acts at issue, this ultimately presents a question of fact 'which must be resolved by the jury before it can draw any inference regarding defendant's commission of the charged offense.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 219.)
>
> Here, defense counsel objected to the instruction on the ground that defendant did not commit the crime of making a criminal threat. But by that point, the evidence had already been admitted, and whether defendant committed the prior crime was a question of fact for the jurors to resolve. Accordingly, after instructing on the elements of the crime of making a criminal threat, the trial court properly instructed the jurors to consider the criminal threats evidence only if they determined that the People proved, by a preponderance of the evidence, that defendant in fact committed that offense.
>
> . . . .
>
> In sum, we reject defendant's claims that the evidence pertaining to the 2016 robbery and the threats against William S. was improperly admitted.

*Dunn*, 2021 WL 973386, at *6-9 (footnotes omitted).

Respondent first argues that this claim is procedurally defaulted and unexhausted. A review of the record reflects that Mr. Dunn's appeal to the California Court of Appeal did not raise a constitutional due process argument regarding the admission of the prior bad acts. He only presented a state law claim. Respondent also contends that the claim is procedurally defaulted because Mr. Dunn did not properly object at trial to preserve the issue for appeal.

The Ninth Circuit has indicated that "[p]rocedural bar issues are not infrequently more

complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Court may also deny an unexhausted claim on the merits. See 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) ("a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim"). The Court will not address the exhaustion or procedural default argument and instead review the merits of the claim. Because the claim was not properly exhausted, the Court will review it *de novo*. *See Taylor v. Beard*, 811 F.3d 326, 331 n.3 (9th Cir. 2016) (conducting *de novo* review where state courts rejected claim on procedural grounds and did not consider merits).

To the extent Mr. Dunn argues that the state court erred in its analysis of state law, he is not entitled to federal habeas relief. Whether the evidence was properly admitted under the state evidentiary rules, is purely a question of state law. *See Estelle*, 502 U.S. at 67–68 (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Nor has he met his heavy burden in showing that the admission of the prior bad acts rendered the trial fundamentally unfair. Here, because there were permissible inferences which could be drawn from the evidence, it cannot be said that the admission of the prior bad acts rendered the trial so "fundamentally unfair" as to violate due process. *See Jammal*, 926 F.2d at 920. The prior bad acts were relevant to demonstrate Mr. Dunn's intent to stab the victim and respond to Mr. Dunn's mental health experts who testified that he had disabilities that could have caused him to misunderstand situations and not anticipate consequences to his actions. As the California Court of Appeal found, the prior bad acts demonstrated that Mr. Dunn was capable of acting with the intent to achieve a goal and that he understood actions and consequences. *Dunn*, 2021 WL 973386, at *8. A review of the records demonstrates that there were permissible inferences from this evidence and that its admission did not render the trial so unfair that it violated due process. This claim is denied.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge may grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, Mr. Dunn has made no showing warranting a certificate.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Dunn's petition for a writ of habeas corpus. A Certificate of Appealability is denied. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: September 4, 2024

P. Casey Pitts
United States District Judge